The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. All right. Please be seated. I'll pick up our next case on the Capital Property Management. Morning, Your Honors. Eric Lawson with Silver and Brown for the Appellant Capital Property Management Corporation, which is the assignee of Gunston Corner Condominium Association. If it pleases the Court, I'd like to address the standing issue raised by our pleadings first and then move on to the insurance claim processing fee and whether or not that's covered under the policy. The standing issue is one where the district court dismissed a claim for a construction management fee as part of a breach of contract count in our complaint. This was an error for several reasons. The first is that Joint Appendix 689 is an assignment that states that the assignment to Capital Property Management expressly includes any right to damages by breach by Nationwide of the insurance contract. The Court held that despite this complete assignment of any right to sue for breach against Nationwide, that it was only a partial assignment of a portion of a breach of contract to our client. My Honor, was there a specific assignment on one of the claims? It doesn't make sense to have an assignment of everything and then refer to a specific subsumed assignment. Well, it was actually done in a reverse order, Your Honor. In either event, doesn't the specific become surplusage? There was a recital, a section of recital of facts before the witnesses and then the real contractual language at the bottom of the assignment. And the intent was that to the extent that there was any breach by Nationwide, the remainder of the insurance claim was being assigned. A portion of that remaining claim was the insurance claim processing fee, but it was a complete assignment by the Condominium Association to the property management company to seek the entire breach of contract that was remaining. One of the difficulties that I have with your argument is it seems to me that your argument is really with the Association and that what they're going to get is, in effect, a double recovery. They don't have to pay you and they get to keep the totality of the claim. The terms of the settlement between Capital Property Management and Gunston Corner weren't really before the Court. Only this assignment of the right to sue for the breach of contract action. You understand my question. I do understand your question. And I think the second argument as to standing addresses it, which is that under Virginia law there's no such thing as a partial standing to sue for a cause of action. It doesn't answer it. The reason I think it does is because even if there were a partial assignment, even if this assignment document only granted a portion of the breach of contract action, the entire breach of contract would be something that our client, the assignee, would be entitled to sue over. And the reason for that is that the United States Supreme Court in 2008 in the spring communication case held that even assignees who would pertain no beneficial interest have standing to sue for the entire cause of action. To prevent claim splitting and subjecting a defendant to a multitude of actions by the actions of another contracting party deciding to assign out portions of its claim to multiple assignees. And the remedy is under Federal Rule of Civil Procedure 17, if you believe that one of the other assignees or the original assigner has retained some rights to the cause of action, you can ask that those parties be brought into the suit. But you don't have a right to wait on that and then ask to dismiss portions of the claim for lack of standing because under Virginia law it splits the cause of action, the breach of contract claim, into multiple claims. So those are the two issues on standing. The first being the fact that the assignment was a full and not partial assignment and that it was the language that was below the recitals. The recitals, there's no line in the assignment that says the recitals are incorporated into the contract. It just concerns me, though, that this is just way, being way too complicated. Isn't the issue the fact that the condominium agreement, excuse me, the condominium association had a side agreement that had nothing to do with Nationwide? They asked, they outsourced this work and it wasn't, whether it was or wasn't covered by the insurance contract. And all this talk about standing and about provisions, it just seems to me. Time splitting. Excuse me? Time splitting. Yeah. It clouds the basic issue which seems to me that when you outsource something, is it covered by the insurance contract or isn't it? Why is this case more complicated than that? It's not. If the construction management processing fee were part of the decision by the court and it was treated in the same fashion as the insurance claim processing fee, you'd do a similar analysis, which is that you'd start with the evidence of what work was done, what overtime additional work had to be done for the. The question is the coverage. I mean, the question, the difficulty, it's a little different than articulated by my colleague, but, okay, if the, say the agreement between Gunston and Capital had provided for a 75% claim processing fee, okay, would you have expected Nationwide to pay you 1.875 million? Your Honor, I think that the, it's a matter of proof. It's really a yes or no question. I think it's an absurd amount, that if it were 75%, that would be absurd. So somewhere between 10% and 75%, it's okay? I think that the affidavit of Susan Blackburn, who's test. You don't want to answer my question. Sorry, Your Honor. Yes, I believe that the reasonable amount for an insurance claim processing fee is. So Gunston was actually negotiating not on its behalf, but on Nationwide's behalf? No, this contract was negotiated before the insurance contract was ever entered into. But why would Nationwide be bound by the agreement that you struck with the association? It's not bound by the agreement, but it's bound to pay any extra expenses due to the fire, due to the suspension of operations. No, not any. No, it's cabin, not any extra expenses. Any reasonable and necessary costs that are due to the suspension of the common areas. Correct. And so here, the evidence that was presented at the motion for summary judgment hearing was the affidavit of Stacey Panuccio about what specific things she did for 10 months. She was one of the representatives of the property management corporation who detailed all the extra work that she did to earn that fee. And then. Why does it make either one of them necessarily covered? It's not the component. It's whether the work associated, as Judge Keenan said, with this outsourced activity, processing the claim and management construction is brought back, it's covered under the Nationwide policy. You have to show that it's covered under the contract of insurance so you get nowhere. You agree with that, don't you? Absolutely. Well, then tell us how it's covered under the contract of insurance rather than talking about all these other concepts. The contract of insurance has a business income coverage, and the business income coverage is divided into two parts. It covers lost profits, and one aspect of that is continuing operating expenses, which would be those sums that the condominium association continued to have to pay out, set against the amount of money that it was still able to bring in. Here there was a suspension of operations because there was a partial slowdown in the money coming in because the condominium association stopped collecting fees from the unit owners who were displaced by the fire. And so under its contract with Capital Property Management, it pays $5,000 a month for that, but that's not part of the claim. Instead, it's only that portion of the claim that is proportionate to the size of the loss that is a fee that those homeowners are responsible for under the property management contract in the event of a large loss. And those are covered under the extra expense portion of the policy. Okay, what language? Yes. So the policy starts with, it's on. An extra expense is defined as an expense incurred, and then it lists the different categories. What categories does it come under? So I think you start on JA-550 maybe. I have 550. You kind of have to bounce around the policy in order to find all the relevant definitions. So we can start with JA-550, and the argument is that extra expense means expenses incurred to avoid or minimize the suspension of operations of business and to continue operations at the described premises. So these additional property management costs are a fee that are to avoid the longer suspension, of the longer construction period that would have occurred had there not been a point person doing overtime coordinating between the nationwide policy and the five other insurance policies that the various tenants had, or unit owners had, and between the contractor making decisions, coordinating all that sort of thing as part of the insurance claim processing work. So what is the business of the condominium association within the meaning of the insurance contract? So within the meaning of the insurance contract, I think then you have to look to the definition of operations, which is on 550 or 551, and it says that it means your business activity is occurring at the described premises, which is an undefined term. But you also have to look at the insuring clause. Isn't that arguably contemplating ordinary business and ordinary operations, not those caused by the loss? I think that's correct, except for if you go to JA 521, that's the section that is the insuring clause that calls for payment of extra expense. And what it says is we will pay necessary extra expense to you incurred during the period of restoration, both of those being defined terms, that you would not have incurred if there had been no direct physical loss of or damage to the property at the described premises. That's necessary for continued normal operating expense. They all tend to tie back to the definition of business expense, don't they, the necessary continuing normal operating expenses? I guess I could use it. Operations are suspended, including payroll. Payroll is a huge category of extra expense in a typical business income claim. If a business goes down and you have to hire your employees to work overtime, that overtime amount is an extra expense. And you look at a trend analysis between what was being spent versus what was being brought in, and you look at what additional amounts needed to be spent during the period of restoration. Here the period of restoration was 10 months because that's how long it took to repair the building. It's our contention, and we believe the evidence would show, that it would have taken longer if capital property management hadn't been involved as a property manager. Well, we're talking about the insurance claim processing fee specifically. Yes, Your Honor. Without a coordinator, without a full-time coordinator to determine which portions of the claim were covered by a unit owner's policy and the condo policy, which only covers common areas, and to set the order of construction between the contractors doing different work, and to be the point person for communicating with all the unit owners, one by one, as far as what is owed by each one, who is moved back in, who needs to get a bill, all that work is over and above the normal $5,000 a month ordinary property management fee. And so when you have a but-for causation on we will pay necessary extra expense you incur during the period of restoration that you wouldn't have occurred if there hadn't been a fire, then that coverage is not restricted to what kind of extra work is going to be done or necessary. It's only a matter of fact. You want us to say then that outsourcing an insurance claim processing fee is a normal operating expense of a business. It is for a condominium association, and this policy was specifically sold as a condominium policy, and that's really what the affidavit- It's not a normal operating expense. It's a normal operating expense because all homeowners associations pay property management companies to manage their property a set amount, and then in the event of a loss or a big construction project, there's an additional fee for managing that bigger project. So it's a project management fee. It wouldn't come to you as a part of the recovery nationwide, but for this assignment? Sorry, no. We represent the property management company who took an assignment. It would have come to the condominium association, correct. We're on behalf of the homeowners, and we stand in their shoes. And really the question is, under this condominium association policy, did the homeowners who purchased this policy believe that in the event of a loss, they would be responsible for the additional costs incurred under their property management contract, or would that be covered by insurance? And unless there's a clear exclusion that the insurance company goes to the Bureau of Insurance and has approved- You have to get inclusion first. I agree, Your Honor, and my time is up, but the inclusion comes from the extra expense language in the policy because, as my colleague noted in her brief on page 29 of the response, under the property management agreement, the insurance claim processing fee is an extraordinary expense. So it's- Yes, sir. Thank you. Ms. Skilling, let's hear from you. May it please the Court. My name is Elizabeth Skilling. I'm with the law firm of Harmon Clay or Corgan & Wellman here in Richmond, and I represent Nationwide Property and Casualty Insurance Company. I just want to start briefly and try to clear up some confusion here. My colleague, Mr. Lawson, appears to have muddled the distinction between a business income claim and an extra expense claim. Those are two separate coverages with two separate insuring agreements and governed by different definitions. If you look at the district court opinion, the court outlines what claims were paid under the policy. There was a building claim made, emergency repairs, demolition and debris removal, recoverable depreciation, and ordinance and law coverage. And at page six of the district court opinion, the court lists all of those in the amounts. Here, there was no business income loss. There's absolutely no evidence that the association lost any stream of revenue or that it even suspended its operations at all. In fact, Ms. Panuzio, the property manager or the primary property manager, clearly proceeded with her duties as she normally did and handled the processing of the insurance claim as the property management agreement told her that she had to. So with regard to all the references to payroll and business income, those are under coverage G, which is at appendix 520 and 521. There is no such claim made here. So all of the operating expenses and all that go out the window. The sole question that has been litigated both at the district court and briefed here is whether coverage H, the extra expense coverage, applies. And yet we would submit that this is an outsourced, the association elected I think to have no employees and they outsourced for roughly $5,000 a month the operation of the association, the collection of fees, the collection of dues, the mailing of letters to the owners of the units, you know, to collect assessments, to maintain the property, to get the yard mowed and all that. That's the operation of the association. And our position is Mr. Lawson indicated that the management agreement really wasn't before the district court, but in fact it was before the district court at 947 through 962 of the appendix. And I would just point out a few terms in that contract that I believe are highly relevant. At 947, capital is named the exclusive agent for Gunston. Under paragraph 1 where it says exclusive agent, it says the association hereby appoints capital property management and capital property management hereby accepts appointment as exclusive managing agent under the terms and conditions as set forth herein. And then if you go over to page 950 of the appendix, it talks about insurance and what capital property management is supposed to do with regard to insurance, which includes estimating the cost of repair or replacement in the event of a claim and cooperating and making any and all reports required by any insurance company in connection therewith. And then if you go to page 956 of the appendix, Roman numeral number 4, it says reimbursement of property. Everything done by capital property management pursuant to the provisions of this agreement shall be done as agent of the association. All fees and expenses incurred by capital property management pursuant to this agreement and described herein for the direct benefit of the association will be reimbursed to capital property management. Following is an itemized list of such reimbursable expenses. I'll continue with the agreement to address the categories of arguments starting with what's actually before us. And as I understand it, the argument about the total assignment issue, the claim splitting argument is new. That was not presented to the district court as I recall. Does the assignment clause allow capital to sue on behalf of, to sue for any issue or whether it's delimited by the specific language of the assignment? Well, Your Honor, we believe that it's limited by the specific language of the assignment. You know, we have taken the position. Well, Your Honor, if you look at the assignment itself, the clause at the bottom of page 689 that Mr. Lawson referenced in his argument, well, under witnesses, you know, that's the assignment. The first paragraph is the 10 percent insurance claim processing fee. And the next paragraph says this assignment to CPM expressly includes any right to damages for breach by the association's insurance carrier of its insurance contract with the association and any right arising out of due and complete performance by nationwide. So it talks about this assignment, which to me means that it incorporates the assignment that was granted in the previous paragraph. It doesn't open up, you know, endless possibilities of potential claims against nationwide. And we believe, Your Honor, that the claim here should be limited to the insurance processing fee because that's what was assigned. The Tyler case relied on by the other side, the old, I think it's like 1891 case. Well, it does stand for the proposition that the injured party may sue for the whole contract and then divvy up the proceeds later with anybody who's received an assignment. But I don't think that it holds that the reverse is true. And there's simply nothing, you know, in Virginia law that would say that, you know, an assignee of a part has a right to bring a claim for the whole. And so that gets us to the insurance claim process. And capital bears the burden of proving that that fee is covered by the policy. And your argument is that it is not covered by the policy. Correct. It is not covered by the policy because it doesn't qualify as an extra expense under the policy. And it doesn't qualify as an extra expense under the policy. Specifically why? Well, because it isn't an expense that was occurred to minimize the suspension of business if you cannot continue operations. I believe that's my counterpart's argument under 9B of the definition. And I'll give you an example of when this extra expense coverage would apply. Let's say that the fire at the premises here involved the management office. And in the interim, this property manager still needs to service all of the members of the association. So this extra expense coverage might provide coverage to rent a trailer to set up on the premises or to rent extra computers so that they could work to get the records together to be able to administer to the unit owners of the association. Or let's say that the common area that people could rent out to have parties or whatever was somehow involved in the fire and couldn't be used. That would be an extra expense if they wanted to rent a trailer or perhaps spend some money to convert another area so that the owner could use that. And I do want to contrast, because from a big picture standpoint, this policy includes conditions that are imposed on the insured. One of them is to present their claim, to cooperate with the insurance company, to provide receipts, to obtain estimates, et cetera. It's not fun to have an insurance claim. Your policy imposes duties upon you. But I think it's significant, and at least the overarching theme in my opponent's briefing on this was Ms. Panuzio had to do all of these extra things to make the transition back to a fully occupied by unit owners situation. But if you look at 541 of the policy, the conditions actually, or 541 of the appendix, the property loss conditions actually begin on page 540. And there are all sorts of duties in the event of loss or damage. That's under three. And there are whole lots of things listed there, including asking for inventories of the damages, quantities, cost, values, amount of loss claimed, and detailed descriptions of each item. But if you go over to 541, you'll see the loss payment conditions in the policy. And in the second column over under E, it's under E and then it looks like a subsection C, we will not pay on a replacement cost basis for any loss or damage, one, until the loss or damage property is actually repaired or replaced. And two, unless the repairs or replacement are made as soon as reasonably possible after the loss or damage. This is where it's built into the policy that the insured has to, and here there's no question, this claim was paid on a replacement cost basis. The policy says we pay ACV, you know, once we determine what the loss is, and that check was issued, you know, fairly soon after the fire, and then the recoverable depreciation was issued. So there's incentive built into this contract for the insured, you know, to get replacement costs. They need to do everything they can to hurry that process. Here, capital elected basically on a contingency fee basis to outsource its own duties under the policy, and then it turns to Nationwide and asks Nationwide to pay it. And, you know, that, it's a contract that Nationwide is not a party to, but even if Gunston Corner had its own employees doing these duties, their duties that it had under the contract anyway to make repairs as quickly as possible, get back up and running as quickly as possible. You know, an insurance company doesn't want to have, you know, an extra expense claim or a business interruption claim that goes on interminably because an insured is dragging its feet. And, you know, if it took Ms. Panuzio to coordinate with all of these other insurers, who also aren't parties to this case, you know, about who was going to cover what, you know, that should not be Nationwide's burden because the insured had a duty under the policy to cooperate, to provide receipts, to provide estimates, you know, to allow us to inspect the property, to, and here, if they wanted replacement costs, they would have to pay Nationwide. And if they wanted replacement cost coverage, you know, they also had a duty to do so as reasonably quickly as possible. So your case can really be reduced to one sentence, is that correct, and that is that the claims processing fee is not covered as an extra expense because it is not covered under the policy, but rather that these are tasks that the association is responsible regardless in the event of loss. And they elected to outsource those duties to capital. Yes, Your Honor. That's your case, right? Yes, Your Honor. And I would throw, you know, sort of stepping back to the, I don't think they have a valid claim for the construction management fee, but even if, because it's not part of the assignment. No, I'm agreeing. So why do you feel it necessary to go back to that? Well, because I think in the briefing, what Ms. Panuzio did is sort of, you know, they've kind of muddled, you know, I don't know what category they're claiming it in, but regardless of what she did and which, quote, unquote, bucket it would belong in, all of the tasks were focused on getting the repairs done as quickly as possible. I do think we understand. I just, like where Judge Keenan was, I don't quite understand how this case became as complicated as it was. I mean, to me, it was a question of Gunston not having the right to outsource insurance processing rights, which Nationwide had never agreed to assume. You know, that... Your Honor, that is it in a nutshell. And to the extent they chose to outsource it... They could choose to outsource it, but they couldn't expect Nationwide to pay for it. Yes, Your Honor. You know, as to the management fee, you know, capital doesn't have a right to recover something that, you know, was never assigned. I mean, and so... Honestly, what more is there? I think it's a fairly straightforward case, Your Honor. You know, it's our position that, you know, the activities that, you know, capital did here were nothing more than the duties that were already owed by the insured. And the fact that they outsourced them with another entity to complete the work that needed to be done, you know, it's a fairly straightforward case. And it's not something that we would pay either Gunston or capital for under the policy. Thank you. Well, unless anybody has any further questions, I'll... I would just ask that the Court affirm the ruling of the district. We thank you very much. Thank you. Mr. Lawson. Please, as the Court, I'd like to address a few issues that were raised on the... The first is the issue of the reasonableness of the fees, whether or not it's appropriate to have an itemized overtime amount versus a contingency amount. There's an expert opinion in the file that opines that it is reasonable and typical in the industry, and we believe that that would be an issue for the jury. Going specifically to whether or not this is an extra expense that would be covered under the policy. The policy says that extra expenses, beyond what the normal business of the homeowners association is, would be covered as an extra expense. One of the examples given was if you had to rent an additional office space for the property management company to do work out of. One of the issues was if the association had employees directly, then their overtime would be extra expense. Here, the fact that they didn't have its own employees, but instead contracted with an agent, and the agent had ordinary business expenses that were paid for by the homeowners association, it's not a distinction that makes a difference. The only case that addresses this issue ever that we can find is the GBP case. The GBP case is distinct because in the GBP case, under Texas law and under that policy, it was necessary to find that there was a complete cessation of all business, a complete suspension, and under our policy, it's sufficient for there to have been a slowdown of the operations of the association in order to trigger the extra expense coverage, and that's because suspension is defined as including slowdown under the policy. The evidence that there was a suspension, meaning a slowdown of the collection of dues, is on J.A. 394, and it's an e-mail from Mrs. Panuzio to the unit owners, and it says, please be advised that if you are displaced because of the insured loss, you don't owe full condominium dues in the meantime. And so they're actually collecting less money. And the argument that Mrs. Panuzio only did work that was necessary to be done under the contract with Nationwide anyway is not convincing because that doesn't take it out of the extra expense category. Extra expenses can be all sorts of things, as long as they reduce the suspension of operations. And in this case, whether or not that fact was true, whether or not the evidence supported that determination, should have been a matter for the jury. And so when we have the extra expense category being triggered by any extra expense category, it's a matter for the jury. It's not expense incurred necessarily because of the slowdown of the business, and the business is to have common areas for the unit owners. The question is, does that extra expense category under the policy cover this kind of work, which does absolutely that? And instead of being ruled on by the judge where there's disputed evidence, and really it's only our evidence about what was done and why that work was typical and reasonable in the property management industry, and why contracts should be covered, why non-dominium associations have to pay for it, because the $5,000 a month ordinary fee doesn't cover it, and because it's a fair and equitable way of determining what the cost of the extra work a property management association needs to do in the event of an insurance loss or a construction loss. But the issue isn't the $5,000 fee. I understand, but you're talking about... The problem here isn't whether or not it's reasonable, the problem is who's supposed to pay for it. If the scope of your agreement with the homeowners association doesn't cover, if it isn't sufficient to cover the outsource responsibilities, you really would logically take that out with the homeowners association? I think the real issue is whether or not the insurance policy covers this known extra expense that's going to need to be paid by the homeowners associations on which they're writing coverage. And if they're selling this extra expense coverage, and they don't have a carve-out for property management association fees that increase in the event of an insurance loss, then why would it be that the... We need to incorporate that into our policy going forward. The question is whether it's an extra expense for purposes of the policy. And we believe that it does fall within that definition. Thank you, your honor. We thank you. We'll come down and greet the counsel and move into our final case.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, Barbara Milano Keenan